## COMPAGNIES DES SUCRERIES DE PUERTO RICO, Complainants,

*v.*

## SANTIAGO IGLESIAS, THE FEDERACIÓN LIBRE DE LOS TRABAJADORES DE PUERTO RICO, Dfts.

Equity, No. 306.

1. Upon a verified complaint supported by proper proof, a temporary restraining order will issue to prevent the officers and members of a labor union, and all persons acting under the authority or control of such union or its officers, from in any wise interfering with the peaceful operation of the business of an individual or corporation, by means of threats, violence, or intimidation of any kind; also from annoying or injuring any person, from entering into or continuing in the employment of such employer, and also to prevent the congregation of striking laborers upon or in the immediate vicinity of the employer's premises, in a violent, threatening, or hostile manner.

2. All persons in Porto Rico have a perfect right to affiliate with, organize, or conduct labor unions, so long as the same are conducted in a peaceful or proper manner, and in accordance with the laws of the land. But a court of equity will interfere to prevent serious injury to private rights or property whenever the same shall be seriously threatened, whether it be in the name of a labor strike or in any other manner.

3. A laborer must be always free to accept employment, to enter into employment, and to cease from such employment at any time, and under any circumstances which he may determine for himself, free from all molestation, intimidation, or threats of any kind; and an employer of labor has the same reciprocal right to the protection of the court to employ and discharge laborers, and to operate and manage his busi-

Compagnies des Sucreries v. Iglesias.

ness and property, without interference or intimidation from any out-
side source.

4. "Picketing," which has been defined by the supreme court of the state of
Washington as a malicious and aggressive interference of strikers
with the business of employers, is declared to be illegal, and will be
enjoined in a proper case.

5. Labor organizers and leaders must exercise great caution that the oc-
currence of strikes should not be made the occasion or excuse for riot-
ing, violence, threats, incendiary appeals for the arraying of labor
against capital.

6. It is well settled by the decisions of the highest courts that in a proper
case a court of equity will enjoin a threatened strike, and that such
injunction will issue in any case where labor organizations shall deliber-
ately, in advance, conspire and combine to attack property of em-
ployers, by combining and agreeing to call a general strike for the en-
forcement of unjust demands, under conditions which must necessarily
result in great loss or injury to employers.

7. In this case a decree *pro confesso* having been regularly entered and con-
firmed in open court, and no showing having been made of a meritorious
defense, the restraining order is made permanent.

Opinion and decree filed December 13, 1905.

---

*Messrs. Hartzel & Serra,* solicitors for plaintiffs.

*Mr. Salvador Suau,* solicitor for defendants.

McKenna, Judge, delivered the following opinion:

In the above action a complaint was instituted by the com-
plainant, operating a sugar central and plantation, against
the defendants, during the month of April, 1905, at which time
a strike of agricultural laborers was in force at the property of
the complainant situate in the district of Ponce. An injunc-
tion against the defendants as officers and members of the

---

NOTE.—As to injunction against strikes, see note to Longshore Printing
& Pub. Co. v. Howell, 28 L.R.A. 464.

Compagnies des Sucreries v. Iglesias.

Federación Libre de los Trabajadores de Puerto Rico, as well as in their individual capacity, and their agents, servants, and all acting under their advice, direction, or authority, was prayed for to restrain all such persons from in any wise interfering with the peaceful operation of complainant's business and property by means of threats, violence, or intimidation of any kind, as also from annoying or injuring any persons entering into or continuing in the employment of complainant; and further praying to prevent the congregation of laborers upon or in the immediate vicinity of complainant's premises, in a violent, threatening, or hostile manner.

The complainant, in praying for an injunction and restraining order, charged that the defendants officially and individually had promoted the strike of the agricultural laborers then in progress, and that, in doing so, had made threats of violence and destruction of property of complainant, and had been guilty of acts of intimidation and interference with such laborers who were willing to work. An exhibit attached to said bill was a communication by the defendant Iglesias, signed as the representative of the American Federation of Labor as well as representing the Federación Libre, defendant, directed to the complainant company, making certain demands which would be required in connection with the employment of complainant company's laborers, and presenting and threatening the alternative that an immediate strike of such laborers in the employment of complainant would be declared. A number of printed handbills, which had been circulated and posted publicly in the district where said strike was in progress, were also in evidence, the same having the authority of the said defendant, Federación Libre, or its officials. The contents of these publications were of a highly inflammatory character, calculated to incite the passions of workingmen and to arraign them

Compagnies des Sucreries v. Iglesias.

against their employers, and tending to provoke a breach of the peace.

On due proof of the allegations of the complaint, the temporary restraining order was issued. The defendants were duly served by the United States marshal with the process and copies of the restraining order, which, as the writs of all courts of the United States, are issued to command obedience thereto in the name of the President of the United States. The defendants promptly obeyed the restraining order when read and explained to them by the marshal, and the laborers involved all returned to work within a few days thereafter, the strike having been settled. This prompt obedience and respect for law and order by the defendants and those involved in the strike calls for congratulations on the display of good sense and sound discretion on the part of defendants.

On the return day of the summons, the defendants, accompanied by a number of workingmen, attended the court in person and submitted themselves to the further orders and directions of the court in the premises. A decree *pro confesso* was entered at the October term of court, defendants having tendered no answer. Subsequently, application was made by defendants for leave to file an answer and to reopen the decree, which was declined because it appeared that the strike was settled and that no injury would be sustained to defendants by permitting the decree sustaining the existing injunction to stand. The court, having read the petition for reopening the decree, and noting the averments that the members of the Federación Libre, defendants, desired further information respecting the object and obligation of the restraining order and their right to organize labor unions and to inaugurate strikes, deems it proper to furnish the information on the points as specially requested.

The court desires to disabuse the impression alleged to be

Compagnies des Sucreries v. Iglesias.

existing among many members of the Federación Libre, defend-
ants, that the injunction issued in this case had for its object
the interference with the free right of all persons in Porto Rico
to organize labor unions or to conduct the same in a proper
manner for the benefit and improvement of the condition of
their members.    This absolute right is guaranteed to citizens
of Porto Rico in every respect as fully as the same is enjoyed
and exercised by all citizens of the United States.    No word
in the injunction decree issued in this case in any manner
abrogates or limits the lawful and proper exercise of such rights.
Courts, however, have, and, in proper cases, must always exer-
cise, authority to promptly restrain and prevent serious injuries
to private rights and property whenever the same shall be
threatened, or its free use and control by the owners is illegally
interfered with, whether it be under the name of a labor strike
or in any other manner.

The power of courts in proper cases to issue injunctions to
prevent irreparable injuries has existed from the foundation of
the government of the United States, and for centuries before
in Great Britain, and, indeed, their origin dates back also much
earlier, being recognized by the civil or Roman law.    From
the necessity of the case, an injunction or restraining order to
prevent imminent danger and irreparable injury is usually
issued without a hearing to defendants.    It is only, how-
ever, but temporary, and the court is always open to have
the injunction in such case dissolved promptly on a hearing,
which the law always accords the parties.    Disobedience to the
restraining order of the court is not alone punishable for con-
tempt in cases of labor strikes, as is often suggested, but it
alike applies to all forms of disregard and disobedience of
proper orders of court by citizens, court officers, including mem-
bers of the bar practising in the courts.    The punishment for

contempt in disobeying a proper restraining order of the court is not the usurpation of illegal power by the court, as is often charged. The power of the court to issue injunctions, without power to enforce obedience to its lawful decrees, would indeed be a mockery of justice. It would be a vain authority in the court to issue injunctions in proper cases, and to withhold the power of enforcing the same by punishing for contempt those who disobey or defy the valid decrees of the court. Without such power in cases of labor strikes and that of all other citizens defying the lawful orders of the court, would soon lead to anarchy and rebellion against the law and the government. A government with injunction has often been denounced as liable to arbitrary abuse, but a government without the power of injunction would afford no adequate remedy for abuses and defiance of law, and would, as stated, soon degenerate into open rebellion and anarchy.

The rights of labor organizations, however, in the matter of strikes, have been well defined by the Federal courts of the United States in many recent decisions, as well as the question of the power to restrain threatened injuries of the serious character alleged in the bill of complaint. A laborer must always be free to accept employment, to enter into employment, and to cease from such at any time and under any circumstances which he may determine for himself, free from all molestation, intimidation, or threats of any kind. And an employer of labor has precisely the same reciprocal right to the full protection of the court to employ laborers, to discharge them, and to operate his business and to manage his property without interference or intimidation from any outside source. It has also been decided by courts of the highest authority that labor unions have the right to properly assist and encourage striking employees, but with the express restriction and limitation that such assist-

ance and encouragement shall in no case extend to threats, intimidation, or interference, as already stated, of employer and employee. Labor unions or their agents, as well as their members, must also respect the rights of property. "Picketing" premises of an employer, being the act of stationing men who are on the strike or employed by strikers to prevent laborers willing to work or others from entering the premises of employers, is illegal and. will, on complaint, be restrained. On this subject the supreme court of the state of Washington uses the following language reported in the recent case of Jensen v. Cooks' & Waiters' Union, defining "picketing" as being a malicious and aggressive interference of strikers with the business of employers. The court in said case declares that "men cannot lawfully jointly congregate about the entrance of one's place of business, and there, either by persuasion, coercion, or force, prevent his patrons and the public at large from entering his place of business or dealing with him." [39 Wash. 537, 4 L.R.A.(N.S.) 302, 81 Pac. 1069.].

Judge Smith McPherson of the United States circuit court for the southern district of Iowa, sitting at Keokuk, in a recent decision treating on the subject of "picketing," used the following language: "There is and can be no such thing as peaceful picketing, any more than there can be chaste vulgarity, or peaceful mobbing, or lawful lynching. . . . The argument seems to be that anything short of physical violence is lawful." [Atchison, T. & S. F. R. Co. v. Gee, 139 Fed. 584.]

As the restraining order in this case enjoins "picketing," these rulings of the courts of the highest authority on the subject of "picketing" are submitted as the expressions of the law, and should be strictly obeyed by all members of labor unions.

The duty of labor organizers and members of labor unions engaged in labor agitation should be exercised to prevent strikes. from being the occasion or the excuse for rioting, violence,

Compagnies des Sucreries v. Iglesias.

threats, or incendiary appeals and addresses arraying labor against capital. On this latter subject, we think the ideas expressed at the recent convention of the American Federation of Labor, held in Pittsburg in November last, by John Mitchell, President of the United Mine Workers, are worthy of adoption by all who respect and esteem so honored a representative of labor and one having the varied experience in the greatest of strikes as President Mitchell, when he utters these words of wisdom: "The greatest problem confronting the American people to-day," President Mitchell says, "is the relation of capital to labor." "I have been quoted as declaring that the interests of capital and labor are identical. I never said that. Their interests are not identical. They are reciprocal." On the subject of a general strike urged among coal miners of Pennsylvania, President Mitchell on the same occasion also declared: "It is claimed we ought to reserve the right to strike, and at an opportune time to lay down our tools and bring the operators to terms. That may be right, but the chances are that the operators too would reserve the right to strike and shut down the mines at a time the miners could not afford to live in enforced idleness." President Roosevelt has frequently expressed his confidence in the discretion and wisdom of President Mitchell as an honored representative of labor unions in the United States.

The defendants in this case, and others who are known as organizers, engaged in the propaganda of labor organization in Porto Rico, recruiting their numbers principally from the great mass of agricultural laborers, have voluntarily assumed, in controlling this element, a great responsibility. It becomes incumbent on such leaders to carefully instruct the many inexperienced and, unfortunately, poorly educated members of said organizations, who are industrious and willing to work, that in

Compagnies des Sucreries v. Iglesias.

exchanging the repressive laws under which they formerly lived, for the personal liberty and freedom of speech guaranteed by the government of the United States, they must not fall into the error of construing liberty to mean license, and freedom as abolishing all restraints of law. On the contrary, their members should understand that the United States is pre-eminently a government of law, and that precisely the same law which protects the organization of labor unions and the right of labor to strike for a redress of grievances will be enforced by the government to safeguard and protect property and employers from intimidation, threats, or illegal interference. Should the leaders and promoters of labor unions of agricultural laborers neglect or evade the duty thus imposed upon them and assumed by them as officers and promoters of labor organizations, and fail to instruct their members on the necessity of observing the laws of property as laid down by the courts, the legal responsibility for the results of such disobedience will be visited on them. We cannot, therefore, too urgently impress upon these organizers and leaders of agricultural laborers that their actions and conduct in the matter of promoting and agitating strikes so often leading to disastrous consequences will be subject to severe scrutiny by the citizens of Porto Rico. It is again suggested as sentiments well worthy of being ever present in their minds and deliberations, the remarks already quoted, from President John Mitchell. The same, it is suggested, are equally as applicable to the agricultural laborers of Porto Rico as they are to the coal miners of Pennsylvania.

It is deemed proper to also announce, whilst on the subject of the rights of labor organizations to inaugurate strikes, a right which, as stated, is well recognized by the law, that cases have arisen wherein, owing to the abuse of this right, courts of equity have not hesitated to exercise the right to restrain and enjoin a threatened strike. If labor organizations shall delib-

Compagnies des Sucreries v. Iglesias.

erately in advance conspire and combine to plan an attack upon the property of employers, by combining and agreeing to call a general strike for the enforcement of unjust demands at a time or under conditions which must necessarily result in irreparable loss and injury to an employer and his property, courts will, on such complaint being established, interfere to prevent the threatened and irreparable loss.

Justice Brewer, of the Supreme Court of the United States, in his celebrated lecture on "The Triumphs of Justice," speaking on the exercise of this power, states "that it is much better, much kinder, and more humane to enjoin the commission of acts which amount to crime than for those in authority to remain quiet until the acts are done, and then punish for crime, often ensnaring the ignorant and those driven to crime by others who have no concern except to show the authority of the nonresident boss."

Porto Rico's wealth and resources are necessarily in her fertile soil, and the real basis of her prosperity will therefore be ever dependent upon agriculture. The varied industrial plants, trades, and occupations characterizing the great cities, industrial centers, coal regions, and mechanical occupations so general in the United States have no analogy, even in a small way, in the island of Porto Rico, where nine tenths of all labor is agricultural. The employers of these agricultural laborers are mostly the large sugar refineries, termed "centrals," which, in addition to grinding the sugar cane, are interested in the cultivation of sugar plantations, and in both capacities require labor. Since the American occupation of seven years ago, capital has been attracted to the island, and many new sugar plantations have been developed, and, as a result, the acreage of crops has been very largely increased and wages of labor have also been advanced. It is a hopeful and auspicious sign that the Porto

Compagnies des Sucreries v. Iglesias.

Rican agricultural laborer is ambitious to improve his condition and that of his family and children, promised through the aid and announced object of labor unions properly conducted.

Organizers and members of labor unions may rest assured that the courts of the land organized for administering justice and equity will always be ready and willing to punish the violations of law or equity when committed by an employer, as promptly as they ever will be to assert a strong hand to restrain threatened injuries by the violent and illegal acts of striking employees.

Finally, it is to be hoped that the law-abiding spirit exhibited by the leaders and organizers of the labor union in June last, when the temporary injunction was issued in the present case, in promptly obeying the summons of the court, will be repeated in the event of any future labor troubles, and that differences and conflicts necessarily arising will be settled and adjusted in the legal tribunals fixed by law for the proper determination of such questions.

In this case, the decree *pro confesso* having been regularly entered and confirmed in open court, and no showing having been made of a meritorious defense, it is accordingly ordered that a final decree making perpetual the temporary restraining order heretofore granted be prepared and entered herein.